CASE NO. 22-3163

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| SHAIDON BLAKE, | ) |
|     Plaintiff – Appellant, | ) |
|     v. | ) |
| (FNU) WALLACE; (FNU) GORMAN; (FNU) CHASTAIN; CENTURION HEALTH SERVICES, | ) ) |
|     Defendant – Appellees, | ) |
|     and | ) |
| CHRISTIAN (LNU), | ) |
|     Defendant. | ) |

On Appeal from the United States District Court
For the District of Kansas (Topeka)
The Honorable John W. Lungstrum
District Court No. 5:21-CV-03046-JWL

**SUPPLEMENTAL OPENING BRIEF OF PLAINTIFF-APPELLANT**

Respectfully submitted,

Selby P. Brown, WSBA #59303
Hathaway C. Burden, WSBA #52970
Molly J. Gibbons, WSBA #58357
SUMMIT LAW GROUP PLLC
315 Fifth Avenue South, Suite 1000
Seattle, WA  98104-2682
(206) 676-7000
Attorneys for Plaintiff-Appellant

Oral Argument is requested.

February 16, 2024

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF ISSUES ...............................................................................1

PRELIMINARY STATEMENT ........................................................................2

STATEMENT OF CASE ................................................................................5

    A.    Mr. Blake Filed Numerous Grievances Against Correctional
           Staff and Was Issued Bogus Disciplinary Reports in August
           2020. ...................................................................................5

    B.    On September 3, 2020, in Response to a Purported "Stroke,"
           Defendants Locked Mr. Blake in a Restraint Chair. .............6

    C.    Despite Mr. Blake's Refusal of Medical Treatment, He Was
           Forcibly Medicated with Morphine and Fentanyl and Forced to
           Go to a Hospital During COVID-19. ....................................9

    D.    Doctors Confirmed Mr. Blake Did Not Have a Stroke, and He
           Returned to the Prison to Face More Retaliation. ...............10

    E.    Mr. Blake Filed a *Pro Se* Complaint. ..................................12

    F.    The District Court Screened Mr. Blake's Complaint and
           Requested a *Martinez* Report. ...........................................13

    G.    KDOC Submitted a *Martinez* Report that Flouted the District
           Court's Instructions. ...........................................................15

    H.    Mr. Blake Disputed the *Martinez* Report Statements. ........16

    I.    The District Court Misconstrued Mr. Blake's Complaint as
           Alleging Mere Disagreement with Medical Judgments.....................19

SUMMARY OF THE ARGUMENTS ...................................................................21

STANDARD OF REVIEW .............................................................................23

ARGUMENT ...............................................................................................25

    A.    Mr. Blake Plausibly States a Fourteenth Amendment Claim. ............25

         1.    Mr. Blake Plausibly Alleges He Was Forcibly Medicated
              without an Important Penological or Medical
              Justification. ...........................................................27

         2.    The District Court Erred in at Least Three Respects. ...............30

a.      The District Court Misconstrued Mr. Blake's Allegations. ..................................................31

b.      The District Court Misapplied the Legal Standard. .......34

c.      The District Court Used the *Martinez* Report to Resolve Disputed Facts and Failed to Read the Facts in the Light Most Favorable to Mr. Blake. ...........35

B.      Mr. Blake Plausibly States an Eighth Amendment Claim. .................36

     1.      Mr. Blake Alleged that Defendants Intentionally Caused Him Harm for the Sake of Causing Him Harm. ......................36

     2.      The District Court Erred by Deferring to the *Martinez* Report and Misconstruing Mr. Blake's Allegations. ................39

C.      The District Court Erred by Dismissing with Prejudice. ....................40

CONCLUSION ........................................................................................42

CERTIFICATE OF COMPLIANCE ........................................................43

CERTIFICATE OF SERVICE ................................................................44

# TABLE OF AUTHORITIES

**CASES**

*Abady v. Lipocine Inc.*,
  No. 2:19-cv-00906, 2023 WL 2933080 (D. Utah Apr. 13, 2023)......................32

*Ali v. Duboise*,
  763 F. App'x 645 (10th Cir. 2019) ........................................... 25, 35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................24

*Brever v. Rockwell Int'l Corp.*,
  40 F.3d 1119 (10th Cir. 1994) ...............................................................40

*Callahan v. Poppell*,
  471 F.3d 1155 (10th Cir. 2015) ............................................................38

*Castillo v. Day*,
  790 F.3d 1013 (10th Cir. 2015) ............................................................38

*Cohen v. Longshore*,
  621 F.3d 1311 (10th Cir. 2010) ............................................................40

*Curley v. Perry*,
  246 F.3d 1278 (10th Cir. 2001) ............................................................41

*E.W. v. Health Net Life Ins. Co.*,
  86 F.4th 1265 (10th Cir. 2023) ..............................................................5

*Erickson v. Pardus*,
  551 U.S. 89 (2007)...........................................................................24

*Est. of Lockett v. Fallin*,
  841 F.3d 1098 (10th Cir. 2016) ............................................................32

*Farmer v. Brennan*,
  511 U.S. 825 (1994)....................................................... 36, 37, 38

*Gaines v. Stenseng*, ............................................................................
  292 F.3d 1222 (10th Cir. 2002) ............................................................24

*Gee v. Pacheco*,

627 F.3d 1178 (10th Cir. 2010) .......................................................41

*Green v. Padilla*,
No. CIV 19-0751 JB/JFR, 2023 WL 6540904,
__ F. Supp. 3d __ (D.N.M. Oct. 6, 2023) ........................................37

*Hall v. Bellmon*,
935 F.2d 1106 (10th Cir. 1991) ................................................. 25, 40

*Hovater v. Robinson*,
1 F.3d 1063 (10th Cir. 1993) ...........................................................37

*Howard v. Waide*,
534 F.3d 1227 (10th Cir. 2008) ......................................................38

*Hudson v. McMillian*,
503 U.S. 1 (1992) ...........................................................................37

*Hudson v. Palmer*,
468 U.S. 517 (1984) ........................................................................37

*Kay v. Bemis*,
500 F.3d 1214 (10th Cir. 2007) ......................................... 23, 24, 40

*KT G Corp. v. Att'y Gen.*,
535 F.3d 1114 (10th Cir. 2008) ......................................................24

*Lowry v. Honeycutt*,
211 F. App'x 709 (10th Cir. 2007) ....................................... 20, 33, 34

*Martinez v. Aaron*,
570 F.2d 317 (10th Cir. 1978) ........................................................14

*Miller v. Glanz*,
948 F.2d 1562 (10th Cir. 1991) ................................................. 37, 38

*Murray v. Archambo*,
132 F.3d 609 (10th Cir. 1998) ........................................................40

*Pearson v. Callahan*,
555 U.S. 223 (2009) ........................................................................38

*Purkey v. Green*,
28 Fed. App'x 736 (10th Cir. 2011) ................................................37

*Riggins v. Nevada*,

504 U.S. 127 (1992)..............................................................26, 30, 34

*Ross v. Blake*,
    578 U.S. 632 (2016).........................................................................5

*Sell v. United States*,
    539 U.S. 166 (2003)................................................................26, 29

*Shabazz v. Askins*,
    980 F.2d 1333 (10th Cir. 1992) .............................................24, 25

*Staats v. Cobb*,
    455 F. App'x 816 (10th Cir. 2011) ............................................40

*Swoboda v. Dubach*,
    992 F.2d 286 (10th Cir. 1993) ...................................................25

*Washington v. Harper*,
    494 U.S. 210 (1990)..................................................25, 26, 30, 34

*Wilkins v. Gaddy*,
    559 U.S. 24 (2010)......................................................................37

*Winkel v. Hammond*,
    704 F. App'x 735 (10th Cir. 2017) ................23, 25, 26, 27, 35

*Young v. Davis*,
    554 F.3d 1254 (10th Cir. 2009) ..........................................23, 24

**STATUTES**

28 U.S.C. § 1291...................................................................................1

28 U.S.C. § 1915.........................................................1, 19, 23, 24

28 U.S.C. § 1915A .............................................1, 19, 23, 27, 36

42 U.S.C. § 1983...................................................................................1

**OTHER AUTHORITIES**

6 C. Wright & A. Miller, Federal Practice and Procedure § 1483, at 587
    (2d ed. 1990) ...............................................................................40

Blaise Mesa, *Kansas inmates say prisons discipline them for false reasons.
    One Man says it cost him parole*, NPR KCUR (Oct. 11, 2023),
    https://www.kcur.org/news/2023-10-11/kansas-inmates-say-prisons-
    discipline-them-for-false-reasons-one-man-says-it-cost-him-parole ................32

**RULES**

Fed. R. Civ. P. 12 ...............................................................................23

Fed. R. Civ. P. 15 ................................................................................................40

Fed. R. Civ. P. 4 ..................................................................................................1

## STATEMENT OF PRIOR OR RELATED APPEALS

Pursuant to Tenth Circuit Rule 28.2(C)(3), Plaintiff represents that it is not aware of any other related cases pending in this Court within the meaning of the Rule.

# STATEMENT OF JURISDICTION

This appeal arises from the district court's *sua sponte* dismissal of Mr. Blake's civil rights claims under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim under which relief may be granted.

On February 12, 2021, Mr. Blake filed his *pro se* 42 U.S.C. § 1983 Complaint in the U.S. District Court for the District of Kansas. R. at 3, 9-16.[1] The District Court granted Mr. Blake's request to proceed *in forma pauperis* ("IFP") the same day. R. at 3.

The final judgment was entered August 17, 2022. R. at 7, 325. Mr. Blake timely filed his appeal pursuant to Fed. R. Civ. P. 4(a) of the Federal Rules of Appellate Procedure on August 25, 2022. R. at 7, 326-29. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

I.    Did the District Court err by relying on the *Martinez* Report to resolve factual disputes? (Yes.)

II.    Did the District Court err by dismissing with prejudice the inmate's claim for violation of the Fourteenth Amendment where the inmate alleged that officers invented a medical condition to justify medicating him against his will with narcotics? (Yes.)

---

[1] All citations to "R." refer to the appellate record in this case.

III.     Did the District Court err by dismissing with prejudice the inmate's claim for violation of the Eighth Amendment where the inmate alleged that officers intentionally exposed him to dangerous medically unnecessary narcotics and to COVID-19? (Yes.)

IV.      Did the District Court err by failing to grant leave to amend a complaint where both the *Martinez* Report and additional materials submitted by the plaintiff revealed the plaintiff could allege additional facts to plausibly state a claim? (Yes.)

## PRELIMINARY STATEMENT

This case implicates fundamental due process rights involving prisoner access to the judicial system.  Plaintiff Shaidon Blake's *pro se* Complaint was erroneously dismissed.  Dismissal was *sua sponte* and pre-answer, despite Mr. Blake's extensive allegations of misconduct that—accepted as true—plausibly allege significant violations of his constitutional rights.  This Court should reverse and remand to ensure that the Prison Litigation Reform Act is correctly applied as intended to permit plausible complaints to proceed to adjudication on the merits.

On September 3, 2020, prison staff reported that Mr. Blake was yelling in his cell all day, likely because he had just learned that some of his grievances had been denied.  Then Defendants Officer Gorman, Officer Wallace, Officer Chastain,

and Nurse Christian[2] made up a ruse:  on the pretext that Mr. Blake was having a "stroke," they took him from his cell and restrained him in a restraint chair and leg irons.  Mr. Blake was told he was being taken to the hospital, although he made it clear he was not having a stroke and did not want to go to the hospital during the COVID-19 pandemic.  When EMTs saw Mr. Blake, they remarked that he did not seem to have any symptoms.  Nonetheless, based on Defendants' misrepresentations that Mr. Blake had been exhibiting stroke symptoms minutes earlier, Mr. Blake was administered *fentanyl* and *morphine* "for pain"—despite his protests that he was not in pain and refusals of medical treatment.  Then, someone at the prison submitted a falsified report claiming that Mr. Blake had engaged in misconduct during that hospital stay that was severe enough to get him sent to segregated housing for over a year.  The officer who made that complaint later agreed that the report had been altered and that Mr. Blake had not engaged in the conduct that landed him in segregated housing.

Accepting these allegations as true and in the light most favorable to Mr. Blake, Mr. Blake stated claims for violation of his rights under both the Fourteenth and Eighth Amendments.  With respect to the Fourteenth Amendment,

---

[2] Mr. Blake refers to Defendants Officer Gorman, Officer Wallace, Officer Chastain, Nurse Christian, and Centurion Health Services collectively as "Defendants."

he plausibly alleged that Defendants caused the forcible administration of mind-altering medication without medical and penological justifications. With respect to the Eighth Amendment, Mr. Blake plausibly alleged that Defendants intentionally created significant risks to his health and safety, and as a result of their misconduct, he was forcibly administered mind-altering medication and taken to a hospital during a pandemic.

The District Court erred by failing to accept Mr. Blake's allegations as true—as it must at this early stage of proceedings. It misconstrued his claims as presenting a mere disagreement with the correctional staff's "stroke" assessment. In fact, Mr. Blake's allegations were that the correctional staff *did not* actually believe that Mr. Blake was having a stroke. Based on its misunderstanding, the District Court relied on case law deferring to the correctional staff's medical judgment. Aggravating this error, the District Court used a *Martinez* Report to contradict Mr. Blake's allegations, even drawing inferences *against* Mr. Blake based on information contained in the *Martinez* Report. This violated the established law that, while a *Martinez* Report can serve to bring clarity to a *pro se* prisoner's allegations, it cannot be used to defeat those allegations at an evidentiary level.

Because Mr. Blake has sufficiently alleged a violation of his constitutional rights, this Court should reverse and remand to the District Court so that Mr. Blake

can have his day in court. At a minimum, this Court should reserve and remand

with instructions to allow Mr. Blake to amend his Complaint.

## STATEMENT OF CASE

**A.  Mr. Blake Filed Numerous Grievances Against Correctional Staff and Was Issued Bogus Disciplinary Reports in August 2020.[3]**

The events at issue here occurred while Mr. Blake was incarcerated at the El

Dorado Correctional Facility ("EDCF") in El Dorado, Kansas. R. at 9. While

there, he had submitted numerous grievances and filed several suits.[4] *E.g.*, R. at

31, 32, 35. For example, around August 2020, he had reported an officer for

making a racist joke in the prison yard.[5] R. at 30-31. On August 25, 2020,

Mr. Blake complained about the prison's failure to provide him with a sufficient

opportunity to respond to a series of bogus disciplinary reports (*i.e.*, DRs). R. at

44-46. The facility legal counsel reviewed his grievances and approved their

---

[3] The allegations in Parts A–E of the fact section are drawn from Mr. Blake's Complaint, his additional submissions to the District Court, and the *Martinez* Report, taking all reasonable inferences in Mr. Blake's favor as required by the stage of the proceedings. *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1280 (10th Cir. 2023).

[4] Notably, Mr. Blake has successfully litigated against the prison system in the past, including taking a case to the Supreme Court. *Ross v. Blake*, 578 U.S. 632 (2016).

[5] Mr. Blake's Complaint resulted in dismissal of that officer. R. at 31.

denial on September 2, 2020. R. at 44-46.[6] Mr. Blake spent most of the next day

upset and yelling his cell, after presumably receiving news of these results. R. at

139.

## B. On September 3, 2020, in Response to a Purported "Stroke," Defendants Locked Mr. Blake in a Restraint Chair.

Then, the events at issue here unfolded, demonstrating a pattern of

retaliation against Mr. Blake for his grievances and suits against prison officials.

On September 3, 2020, when Mr. Blake was not a threat to himself or others, was

not provoking officers, and was not committing any infractions, Defendants

Wallace, Gorman, Chastain, and Christian caused Mr. Blake to be removed from

his cell on the pretext that he was having a "stroke." R. at 12 ("[C]orrections staff

w/ Nurse Christian made the decision to force me to go to the hospital off site,

during this pandemic based on their observation, not by request from me. They

said I looked like I was experiencing a stroke[.]"). Mr. Blake protested given that

he did not have "any symptoms of a stroke," declining medical treatment and

asking for a form to do so formally. R. at 12, 83.[7] Shortly after removing him

---

[6] A March 28, 2022 letter from prison officials to Mr. Blake indicates that Mr. Blake's grievance addressing this issue was "misplaced" by prison officials after it was filed. R. at 77.

[7] *See also* R. at 83 ("As stated in the Complaint, plaintiff requested a refusal slip but was denied. Plaintiff clearly articulated his desire to receive no medical treatment"); R. at 125 ("[P]etitioner clearly denied wanting any medical care, he was physically restrained and forced to receive opoid [sic] injections . . . ."); R. at 96 (Officer Gorman confirming that Mr. Blake asked for a refusal form to go to the

from his cell—contrary to their supposed "stroke" observations—Defendants locked Mr. Blake upright in a restraint chair and in leg irons. R. at 10, 156; *see also* R. at 30 (pointing out that Defendants, "if acting in good faith would not have chosen [a restraint chair] as a means to help a so-called 'stroke patient,'" given that a restraint chair could do more harm than good in that circumstance).

Because Mr. Blake was put in a restraint chair, there is video of this interaction. Throughout the video, Mr. Blake was lucid and has presence of mind, gesticulating with clear control of his hands and faculties. *See* R. at 12 (alleging he was not exhibiting any stroke symptoms); *see generally* R. Vol. II, P9030001 ("Video 1"); R. Vol. II, P9030002 ("Video 2"). Consistent with his allegations of retaliation, Mr. Blake was visibly distrustful of the officers throughout the interactions on the videos, opening the longer video with a request for clarification about which Captain had issued the order for him to be restrained and pointing out the inconsistency between his treatment on this day and his prior hospitalization experience. *See, e.g.*, R. Vol. II, Video 1 at 3:40-44 ("This don't feel right . . . . What the f*** is you restraining me for? You don't restrain a mother****** going to the hospital. I've been to the hospital twice. From seg

---

hospital); R. Vol. II, P9030002 ("Video 2") at 11:32-36 ("I need to sign the waiver and go about my business.").

7

I've been to the hospital."); *see also* R. at 300 ("Plaintiff clearly scared and shakes because of fear of being beat while restrained.").[8]

In what—from the guard's telling—was approximately 10 minutes after Mr. Blake had been having a stroke,[9] Mr. Blake called out that the videographer was the same guard that Mr. Blake had recently reported for a racist joke, even quoting the specific prison regulation that the guard violated. *See* R. Vol. II, Video 1 at 5:43-45; 6:30-7:26 ("Norquist is the guy who made the racist joke in the yard. IMPPO 2118 says that because this guy made a racist joke in front of 2 COs and 32 people in the yard, he ain't supposed to have a job. Norquist, can you tell them the joke you made? For the cameras please sir . . . so the warden won't have plausible deniability."). Mr. Blake also referenced having recently filed suit against Officer Norquist based on these remarks. R. Vol. II, Video 1 at 9:49-52. He even contemporaneously called out to fellow inmates the apparent absurdity of Defendants' "stroke" pretext. *See* R. Vol. II, Video 1 at 5:57-6:10 (clearly and controllably projecting: "They say they take me to the hospital cause they said I'm

---

[8] Contrary to the video evidence, the *Martinez* Report reflects that correctional officers justified the use of restraints "due to the resistance by kicking, threats of fight, and hopping off table hostile." R. at 300.

[9] *See* R. Vol. II, Video 1 at 12:13-24 (stating roughly 12 minutes into filming that Mr. Blake had been experiencing symptoms 20-30 minutes ago).

having a stroke but they f\*\*in me up like this.  A man that's having a stroke like this.  This is what they do.  You already know.").[10]

## C.    Despite Mr. Blake's Refusal of Medical Treatment, He Was Forcibly Medicated with Morphine and Fentanyl and Forced to Go to a Hospital During COVID-19.

When Mr. Blake was brought to the EMTs, they observed that there was nothing apparently wrong with him; they continued treatment *only* because of the representation from Defendants that he *had earlier* shown stroke symptoms.  R. Vol. II, Video 1 at 18:20-23 (EMT: "I don't see any symptoms going on right now."); R. Vol. II, Video 1 at 18:05-12 (EMT: "Because of the fact that he had stroke-like symptoms and those could occur again, it could get worse and that's my problem."); *e.g.*, R. Vol. II, Video 1 at 12:13-24 (Defendants telling EMT that Mr. Blake's speech had been slurred and that he was "stumbling around in his cell").

While with the EMTs and under the supervision of Defendants, Mr. Blake continued to try to refuse medical treatment and stated he was not in pain.  R.

---

[10] During this same period, Mr. Blake had been unable to take his medication, eat, or sleep for the previous few days because he just had oral surgery and because of his PTSD.  *See* R. Vol. II, Video 1 at 14:55-15:18; 19:00-36.  He also had anxiety about "issues" at the prison, R. Vol. II, Video 2 at 11:01-06, and deep-rooted fears of going to the hospital and of contracting COVID-19, *see, e.g.*, R. Vol. II, Video 1 at 11:48-12:04 (asking the Defendants and the EMTs to fix his face mask because he did not want to contract COVID-19); R. Vol. II, Video 1 at 13:40-45 (explaining that he was afraid of the hospital); R. Vol. II, Video 1 at 14:15-40 (same); R. Vol. II, Video 1 at 23:08-20.

at 33; R. Vol. II, Video 1 at 11:01-03 (EMT: "Are you hurting anywhere by chance?" Blake: "No man."); R. Vol. II, Video 2 at 5:09-14 (Mr. Blake stating that he had disliked being on narcotics before and "I don't want nothing that's gonna make me sleepy man.").  Nonetheless—because of the misrepresentations by Defendants that Mr. Blake had stroke symptoms earlier—EMTs continued to evaluate Mr. Blake.  Ultimately, with encouragement from Defendants, Mr. Blake was given powerful narcotics morphine and fentanyl "for pain."  R. Vol. II, Video 2 at 5:12 (EMT: "It's for the pain.").  Based on Mr. Blake's lengthy history with the prison system, he knew it was highly irregular for medical staff to dispense narcotics.  R. at 33 ("KDOC has never volunteered a narcotic for pain relief.  In fact narcotics are rarely used.").

Mr. Blake was then taken to the hospital.  R. at 12, 34-35.

## D. Doctors Confirmed Mr. Blake Did Not Have a Stroke, and He Returned to the Prison to Face More Retaliation.

At the hospital, physicians confirmed the obvious:  Mr. Blake did not have a stroke.  R. at 32 (stating that hospital doctor found "no stroke or symptoms of" a stroke); R. at 34 (explaining the claim that he was having a stroke was "proven by emergency room doctors at Wesley Hospital to be false"); R. at 34-35 ("Plaintiff did not suffer a stroke or nothing similar."); *see also* R. at 196.

His mistreatment continued *after* his return from the hospital, showing that Defendants' conduct was part of an ongoing course of retaliation against

Mr. Blake.[11]  On his return, Defendant Officer Gorman placed Mr. Blake into a cell "used for quarantine of Covid-19 infected prisoners," rather than putting Mr. Blake into his "designated cell." R. at 32.  The cell had just been used by an inmate with COVID-19 and was not cleaned before Mr. Blake was added to it. R. at 32-33.  Mr. Blake was very scared of COVID-19, contracted COVID-19 as a result of the events alleged above, and suffered an episode of PTSD. R. at 33-34.

Additionally, someone at the prison manufactured a fictitious report asserting that Mr. Blake had threatened officers while he was at the hospital on September 3. R. at 125-26.  Because of this report, Mr. Blake was placed in segregated housing for one year and eight months. R. at 287.  Eventually, the officer who was credited with making the allegation against Mr. Blake admitted that the report had been "altered and what the narrative stated now is not what happened." R. at 298; R. at 125-26 (explaining that Mr. Blake did not threaten officers and providing more context for the retaliatory scheme).

---

[11] One of Mr. Blake's submissions is missing a page, jumping from a narrative version of events to a description of the contents of Mr. Blake's exhibits. R. at 35-36.  Though missing its intended context, the last page of Mr. Blake's submission reflects serious allegations of prison staff misconduct supporting Mr. Blake's allegations of a sustained period of retaliation. *E.g.*, R. at 36 (explaining that his legal mail was significantly delayed causing his criminal appeal to become time-barred). The District Court did not bring the missing page to Mr. Blake's attention.

### E.    Mr. Blake Filed a *Pro Se* Complaint.

On Feb. 12, 2021, Mr. Blake filed a handwritten Complaint using a pre-printed form for a "Civil Rights Complaint Pursuant to 42 U.S.C. § 1983." R. at 9 (emphasis removed). Mr. Blake named as Defendants Officer Wallace, Officer Gorman, Officer Chastain, Nurse Christian, and Centurion Health Services ("CHS"). R. at 9, 13. Officers Wallace, Gorman, and Chastain were correctional officers at EDCF who were "unit supervisor[s]" at the time of the events at issue in the Complaint. R. at 9, 13. CHS was health care service provider to the Kansas Department of Corrections ("KDOC"), and its employees were "responsible" for the medical treatment received by prisoners at EDCF. R. at 13. Nurse Christian was employed by CHS and was "an agent of the Kansas D.O.C. providing medical services for prisoners" at the time of the events alleged in the Complaint. R. at 13.

Based on the events of September 3, 2020, Mr. Blake brought claims for violations of his Fourth,[12] Eighth, and Fourteenth Amendment rights to refuse invasive medical treatments, to avoid the involuntary administration of narcotics, and to be free from excessive force. R. at 10-14.

---

[12] Mr. Blake is not appealing the dismissal of his Fourth Amendment claim.

**F.    The District Court Screened Mr. Blake's Complaint and Requested a *Martinez* Report.**

While screening Mr. Blake's Complaint under 28 U.S.C. § 1915(e)(2)[13] and 28 U.S.C. § 1915A,[14] the District Court ordered Mr. Blake to provide additional detail related to the statute of limitations[15] and about certain Defendant's individual involvement with respect to the alleged misconduct.[16]  Mr. Blake complied, adding some of the details described in the above fact sections.  *See generally* R. at 27-57; *e.g.*, R. at 35 ("Plaintiff states that due to pending legal matters involving KDOC staff and medical personnel, decisions were made to restrain plaintiff and force him to go to the hospital."); R. at 31 ("[E]ach staff listed in this Complaint has been the subject of complaint grievances wrote [sic] by the plaintiff concerning the disregard of established policy for masks requirements for staff and population."); R. at 32 (stating that hospital doctor found "no stroke or symptoms of" a stroke);

---

[13] 28 U.S.C. § 1915(e)(2)(B) (stating, with respect to IFP plaintiffs, that "the court shall dismiss the case at any time if the court determines that" the complaint "is frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief").

[14] 28 U.S.C. § 1915A (mandating screening and dismissal of prisoners' complaints against governmental entity or employee of such an entity if the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted" or "seeks monetary relief from a defendant who is immune from such relief").

[15] R. at 20.

[16] R. at 20-21.

R. at 34 (explaining the claim that he was having a stroke was "proven by emergency room doctors at Wesley Hospital to be false"); R. at 34-35 ("In fact, to inject the highly addictive morphine and within 15-30 minutes later follow up with fentenol [sic] would be wreckless [sic] and dangerous.").

On February 3, 2022, after reviewing Mr. Blake's thorough submissions, the District Court acknowledged that the Complaint was timely filed, that Mr. Blake had clarified the personal involvement of Defendants Gorman and Chastain, and that he was alleging an improper retaliatory motive on the part of all Defendants. R. at 58.

Nonetheless, the District Court requested a report pursuant to *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), based on its conclusion that "the proper processing of Plaintiff's claims cannot be achieved without additional information from appropriate officials of the EDCF." R. at 59-60. Accordingly, the District Court ordered the "Officials responsible for the operation of the EDCF" to review the subject matter of Mr. Blake's Complaint, "[t]o ascertain the facts and circumstances," and to include "pertinent rules, regulations, official documentation, and wherever appropriate, the reports of medical or psychiatric examinations." R. at 59-60. The District Court's Order required any witness statements to be submitted as affidavits. R. at 59. The District Court stayed

discovery and motion practice until after submission of the *Martinez* Report.  R.
at 60.

After the District Court's Order, but before the *Martinez* Report was filed,
Mr. Blake submitted still more records that supported his claims and arguments.
Specifically, Mr. Blake stated that he was subject to "unordinary treatment" in this
action because he was labeled as a "trouble maker" in light of his past lawsuits
against EDCF prison officials.  R. at 66-67; *see also* R. at 91 (explaining that a
course of retaliatory conduct started after his books were banned, including
retaliation involving his "conviction of 6 disciplinary infractions without having
hearings").  Accordingly, Mr. Blake asserted that those other lawsuits support his
retaliation theory and that the defendants and facts from those lawsuits should thus
be added to the instant action.  R. at 65-67; *see also* R. at 68-78 (supplement to
motion to amend containing additional discussions of grievances filed by
Mr. Blake in which he alleged that prison officials violated his civil rights); R. at
91 (recounting a call from Mr. Blake where he stated "that he had been forcefully
injected with morphine and fentanyl" and "[t]hey done admitted the medication
was wrong . . . .").

## G.     KDOC Submitted a *Martinez* Report that Flouted the District Court's Instructions.

The KDOC filed the *Martinez* Report on June 21, 2022.  *See* R. at 137-88.
The exhibits to the *Martinez* Report included unsworn incident and narrative

reports from the staff involved in the incident, pictures of Mr. Blake and the officials involved, and two videos that depict Defendants' placement of Mr. Blake in the restraint chair and their interactions with Mr. Blake while he was in the restraint chair. R. at 138, 143-88; *see generally* R. Vol. II, Video 1; R. Vol. II, Video 2.[17]

Despite the District Court's order requiring witness statements to be submitted "in affidavit form," R. at 59, the KDOC submitted only one affidavit: that of Lt. Alan Taylor, who was relying only on second-hand information, *see* R. at 138 (listing exhibits to the *Martinez* Report); R. at 148 (five-paragraph affidavit from Lt. Taylor). None of the many correctional facility employees who were present during the events of September 3, 2020 provided a sworn affidavit.[18] *See* R. at 138. And notably, the *Martinez* Report lacked any medical records.

## H.    Mr. Blake Disputed the *Martinez* Report Statements.

Mr. Blake responded to the *Martinez* Report,[19] disputing numerous included assertions and immediately highlighting that he had not been interviewed in

---

[17] Consistent with the legal standard, the previous sections of this brief have relied on the *Martinez* Report contents that clarify Mr. Blake's allegations.

[18] In fact, in a subsequent filing, Mr. Blake alleges that Defendant Officer Gorman recently contradicted the *Martinez* Report while speaking with Mr. Blake. *See* R. at 300 (quoting Officer Gorman as saying that he restrained Mr. Blake "only because of protocol and not because of kicking").

[19] The exhibits attached to Mr. Blake's response include motions and orders from the instant case, notices of electronic filing from the instant case, grievance and

connection with the Report despite the Order's invitation to do so. *See* R. at

193-276; *see, e.g.*, R. at 195-96 ("The one fact both parties are in agreement on is

the fact that plaintiff refused all medical procedures after consenting to being

triaged. This was to allow the nurse to see plaintiff was not experiencing any life

threatening stroke."). And unlike Defendants, Mr. Blake asked the Court to take

his representations as sworn statements. R. at 198 ("So plaintiff relies on all his

exhibits, especially the motions submitted to this Honorable Court to act as his

official sworn statement because all motions and presentations are declared under

the penalties of perjury.").

Mr. Blake's rebuttal of the *Martinez* Report was consistent with his prior

filings, simply adding more detail in response to the new version of events. For

example, he continued to emphasize the absurdity of Defendants' use of a restraint

chair if they had actually believed he was in medical danger, highlighting that they

broke prison procedure to do so. R. at 195. Relatedly, Mr. Blake unambiguously

disagreed with the Report's characterization that he was combative and that he

tried to get down from the examination table. R. at 193-95; *see also* R. at 210

(noting that Mr. Blake was, at most, verbally aggressive during the September 3,

---

disciplinary hearing/appeal documentation, documents and filings from two of
Mr. Blake's other civil rights actions, and emails between KDOC and Maryland
Department of Corrections officials related to Plaintiff's classification status. *See*
R. at 205-76.

2020 interaction). Further supporting his point that the "stroke" allegation was pretext, he explained that the hospital physician determined that Mr. Blake had not had a stroke "without any test or procedures, only a visual look over. Then the doctor was ready to discharge plaintiff." R. at 196.

Similarly, Mr. Blake asserted that the *Martinez* Report's statement that the EMTs gave pain medication to Mr. Blake with no input or assistance from EDCF Staff was incorrect because, as Mr. Blake previously alleged, Defendant Christian was the one who suggested the EMTs medicate Mr. Blake while briefing the EMTs on Mr. Blake's condition. R. at 196. He even identified a photo within the *Martinez* Report that showed Nurse Christian working on Mr. Blake while he had an IV in his arm. R. at 196.

Mr. Blake also added details regarding his retaliation allegations. He cited various grievance/disciplinary documents and pleadings from his other lawsuits to substantiate his claims that Defendants acted with a retaliatory motive in this action. *See* R. at 198-203. For example, Mr. Blake explained suspicious conduct by corrections officers in connection with his disciplinary record adjudications, such as the fact that multiple adjudications about different reports allegedly happened at the exact same minute on the exact same day, in front of different officers. R. at 199-200; *see also* R. at 239-46 (showing reports for two different

hearings, in front of two different officers, that allegedly took place on "8/17/20" at "0932 hours").

## I.  The District Court Misconstrued Mr. Blake's Complaint as Alleging Mere Disagreement with Medical Judgments.

After reviewing the *Martinez* Report and Mr. Blake's responses thereto,[20] the District Court dismissed Mr. Blake's Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim "for the same reasons outlined in the Court's order to show cause." R. at 309. In analyzing each of the claims, the District Court operated from the mistaken theory that Defendants *actually* believed that Mr. Blake was having a stroke. R. at 309 ("Plaintiff's Complaint alleges that he was forced into a restraint chair and given injections of morphine and fentanyl when he refused to be transferred to a hospital after EDCF staff determined that he may have been having a stroke."); R. at 314 ("At the time, the defendants did not know that Plaintiff's life was not in danger. They made an assessment based on what they saw . . . .").

With respect to the Fourteenth Amendment claim, the District Court asked only whether the officials deemed the medication at issue "necessary to carry out valid medical or penological objectives." R. at 312 (quoting *Lowry v. Honeycutt*,

---

[20] The District Court appears to have considered all materials submitted by Mr. Blake, including the exhibit attached to his motion to supplement. *See* R. at 321.

211 F. App'x 709, 712 (10th Cir. 2007)).  The District Court rejected the notion

that Defendants had acted with retaliatory motive, determining that "*the Report*

provides no support [sic] Plaintiff's assertion that the defendants had anything

other than a valid medical objective for their actions."  R. at 313 (emphasis added).

The Court did not find "persuasive" Mr. Blake's "allegations, incidents, and

grievances" in the time period immediately surrounding the September 3, 2020

events.  R. at 313.

With respect to the Eighth Amendment theories, the District Court rejected

the claim against Nurse Christian because "Plaintiff does not demonstrate any

improper motive for Nurse Christian's medical judgment or the actions of

corrections staff in implementing Christian's decision to send Plaintiff to the

hospital."  R. at 314.  Again, the District Court misapprehended Mr. Blake's

allegations as a "mere difference of opinion" with Nurse Christian's observations

and determined that "mere difference of opinion" failed to create a foundation for

an Eighth Amendment claim.  R. at 315 ("A difference of opinion between a

medical provider and a patient does not give rise to a constitutional right or sustain

a claim under § 1983.").  Despite Mr. Blake's allegations of retaliation, the District

Court relied heavily on the video, and the *Martinez* Report more generally,

concluding that there was nothing to suggest that Defendants—who knew they

were being filmed—were acting with any improper motive.  R. at 317.

Finally, the District Court faulted Mr. Blake for not specifically detailing the actions of Defendants Gorman and Chastain. R. at 319. Notably, the video clearly shows that both Defendants Gorman and Chastain were present for the duration of the events on September 3, with both of them seemingly answering the EMT's question about when Mr. Blake allegedly exhibited "symptoms." *See, e.g.*, R. Vol. II, Video 1 at 23:52.

Based on these conclusions, the District Court dismissed the Complaint with prejudice and without providing Mr. Blake leave to amend. The District Court entered final judgment on August 17, 2022. R. at 309-22, 325. Mr. Blake filed his notice of appeal on August 25, 2022. R. at 326-29.

## SUMMARY OF THE ARGUMENTS

The District Court's ruling represents a fundamental misapprehension of the allegations made by Mr. Blake and a misapplication of both the law and the *Martinez* Report. Contrary to the District Court's analysis, Mr. Blake did not allege a mere difference of opinion with Defendants regarding whether he experienced a stroke. Rather, he alleged that Defendants knew he was *not* having a stroke and said as much only to further a ploy to retaliate against him. Though these allegations may sound extraordinary, at this stage in the litigation, they must be taken as true with all inferences drawn in the light most favorable to Mr. Blake. In any event, Mr. Blake went above and beyond his pleading obligations at this

stage, submitting significant *evidence* of retaliation. This included documents supporting two theories of retaliation: first, that he was forcibly medicated and taken to the hospital in retaliation for recent grievances and, second, that he was punitively held in segregated housing for *one year and eight months* following his discharge from the hospital based on a falsified hospital report. Doubling its error and contrary to well-settled law, the District Court used the *Martinez* Report to contradict Mr. Blake's allegations and resolve fact issues, seemingly concluding that Mr. Blake's allegations were not credible.

Accepting Mr. Blake's allegations in the light most favorable to him, as the Court must, he has made out claims that Defendants violated his Fourteenth and Eighth Amendment rights. Relevant to both claims, Mr. Blake's allegations show a pattern of retaliatory conduct that began before September 3, 2020 and continued for months after that date with his contrived placement in segregated housing. Mr. Blake has further alleged that he was not having a stroke and did not express any symptoms of a stroke on September 3, but that he was nonetheless medicated with heavy duty narcotics against his will after asking for forms to deny medical treatment. This course of conduct is more than sufficient to make out claims for both Fourteenth and Eighth Amendment claims at this early stage in proceedings.

Though at this stage in proceedings evidence is not necessary to support Mr. Blake's claims, his version of events is supported by written prison records

and video evidence. Mr. Blake's presentation in the video is fundamentally at odds with even a laymen's understanding of a person experiencing a stroke. His behavior makes far more sense considering the retaliatory conduct to which he alleges he was subjected.

Even setting aside the above errors, the District Court erred by dismissing the Complaint with prejudice. Mr. Blake had submitted significant evidence showing that he had additional facts regarding retaliation and improper motive, and he should have been permitted to amend his Complaint to add those allegations. Additionally, Mr. Blake's allegations are sufficient to state a First Amendment retaliation claim, and he should be permitted to add such a claim.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision to dismiss a complaint under 28 U.S.C. §§1915A(b)(1) and 1915(e)(2)(B)(ii) for failure to state a claim. *See Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007); *Young v. Davis*, 554 F.3d 1254, 1256 (10th Cir. 2009). To evaluate the sufficiency of a complaint dismissed under these statutes, the Court applies the familiar standard used under Federal Rule of Civil Procedure 12(b)(6). *See Kay*, 500 F.3d at 1217-18 (holding the standard of review for Rule 12(b)(6) and Section 1915(e)(2)(B)(ii) dismissals is the same); *Winkel v. Hammond*, 704 F. App'x 735, 736 (10th Cir. 2017) (using the Rule 12(b)(6) standard to review a Section 1915A(b) dismissal for failure to state a

claim). That is, the complaint should survive screening scrutiny if the complaint includes "enough facts to state a claim to relief that is plausible on its face." *Young*, 554 F.3d at 1256 (quoting *KT G Corp. v. Att'y Gen.*, 535 F.3d 1114, 1134 (10th Cir. 2008)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level").

When considering whether to dismiss a complaint under Section 1915, a district court "must accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in the light most favorable to the plaintiff." *Kay*, 500 F.3d at 1217 (quoting *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002)). A district court should dismiss a complaint only if the factual allegations are "[c]learly baseless" meaning that they are "fantastic or delusional." *Shabazz v. Askins*, 980 F.2d 1333, 1334 (10th Cir. 1992). In addition, the court must liberally construe a *pro se* complaint and apply "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

That the District Court ordered the *Martinez* Report does not increase Mr. Blake's burden at this early stage of proceedings. A court may use a *Martinez* report to "identify and clarify the issues" raised by a *pro se* litigant and to assist in a "broad reading of the pro se litigant's pleadings . . . by *supplementing* a

plaintiff's often inadequate description of the practices that he contends are unconstitutional." *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) (emphasis added). But district courts may not use a *Martinez* report "to refute" the plaintiff's allegations "or to resolve factual disputes." *Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993); *Shabazz*, 980 F.2d at 1334 ("A court may consider the Martinez report in making its clearly baseless determination, but it cannot resolve material disputed factual findings when they are in conflict with the pleadings or affidavits." (internal quotation marks and citations omitted)); *accord Ali v. Duboise*, 763 F. App'x 645, 649 n.3 (10th Cir. 2019) ("The *Martinez* report presents a different account of events than that provided in the Complaint. . . . But as the district court recognized, a *Martinez* report cannot be used to resolve factual disputes at the motion-to-dismiss stage."); *Winkel*, 704 F. App'x at 737.

## ARGUMENT

### A.     Mr. Blake Plausibly States a Fourteenth Amendment Claim.

Prisoners have a constitutional liberty interest against the unwanted administration of mind-altering medication. *Washington v. Harper*, 494 U.S. 210, 222, 227 (1990) ("[R]espondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."). Administering medication to a non-consenting prisoner requires a finding of an "important," "essential," and "overriding"

justification and a determination of medical appropriateness.  *Sell v. United States*,

539 U.S. 166, 178-79 (2003); *Riggins v. Nevada*, 504 U.S. 127 (1992) (citing

*Harper*, 494 U.S. at 229); *Winkel*, 704 F. App'x at 737.  For example, medicating a

non-consenting prisoner with antipsychotic medication violates the Due Process

Clause unless (1) the inmate "has a serious mental illness," (2) "the inmate is

dangerous to himself or others," and (3) "treatment is in the inmate's medical

interest."  *Harper*, 494 U.S. at 227; *accord Winkel*, 704 F. App'x at 737.  In

*Harper*, the Supreme Court found this high bar satisfied because the prisoner was

administered antipsychotic drugs against his will *after* the medication was

"prescribed by a psychiatrist, and then approved by a reviewing psychiatrist."  494

U.S. at 222-23.

Courts recognize at least one circumstance where there may be a sufficiently

"important" government interest to override even a non-dangerous prisoner's

objection to antipsychotic medication, namely, to restore competency.  *Sell*, 539

U.S. at 178-81; *Winkel*, 704 F. App'x at 737.  But additional safeguards must be

followed in such cases, including a court finding that the government has shown

the need for treatment overcomes the detainee's interest in refusing it "in light of

the efficacy, the side effects, the possible alternatives, and the medical

appropriateness of a particular course of antipsychotic drug treatment."  *Winkel*,

704 F. App'x at 737.  Accordingly, this Court has reversed a district court's

dismissal of a complaint where a pretrial detainee alleged that he was not dangerous and was not given an adequate hearing to determine whether the medication "was necessary and appropriate." *Id.* at 737-38.

### 1. Mr. Blake Plausibly Alleges He Was Forcibly Medicated without an Important Penological or Medical Justification.

This case presents an apparently unique allegation in this line of cases, which this Court reviews de novo. *See Winkel*, 704 F. App'x at 736 ("We review de novo the district court's dismissal pursuant to § 1915A for failure to state a claim upon which relief can be granted."). Namely, taking Mr. Blake's allegations[21] as true and using the *Martinez* Report only to supplement and clarify Mr. Blake's descriptions, the following emerges:

- On September 3, 2020, Mr. Blake was yelling in his cell and was not posing a danger to himself or others. R. at 10, 12, 139.

---

[21] Mr. Blake submitted robust detail supporting the allegations in his Original Complaint in response to the District Court's show cause order, including a prayer for relief at the end of his submission. R. at 37. The District Court seems to have accepted this response and his other submissions as part and parcel of his Complaint. *See* R. at 313 ("The allegations contained in the Complaint do not overcome that presumption of validity, and nothing in the *Martinez* Report or Plaintiff's response casts anything more than speculative, unsupported doubt on the defendants' motives or the validity of their objectives."). This brief does the same.

- Defendants invented a medical emergency—an alleged "stroke"—in retaliation for Mr. Blake's recent grievances and lawsuits. R. at 10, 12, 31-35.

- Defendants misrepresented to EMT staff that Mr. Blake had symptoms of a stroke and encouraged EMT staff to treat Mr. Blake with addictive and potentially lethal *pain* medication (not antipsychotics). *See* R. at 10; *e.g.*, R. Vol. II, Video 2 at 2:47-49 (EMT: "I'm going to give him some pain meds first." Multiple people: "Yeah."); R. Vol. II, Video 1 at 12:13-24 (telling EMT when Mr. Blake's speech had been slurred and that he was "stumbling around in his cell").

- Mr. Blake did not consent to any medical treatment. *See supra* n.7; *see also* R. Vol. II, Video 2 at 5:09-14 (Mr. Blake stating that he had disliked being on narcotics before and "I don't want nothing that's gonna make me sleepy man.").

- No physician was ever involved in the decision to medicate Mr. Blake with narcotics. *See* R. at 12 (identifying only a nurse and correctional staff as making medical decisions). In fact, the only physician who evaluated Mr. Blake was able to tell by a simple visual inspection that

Mr. Blake was *not* having a stroke and *did not* prescribe Mr. Blake with any medication.  R. at 34-35.

- At the time Mr. Blake was medicated, he was already confined to a restraint chair and was not exhibiting stroke symptoms.  R. at 12; R. Vol. II, Video 2 at 5:09-14 (first medication administered in restraint chair)[22]; R. Vol. II, Video 1 at 18:20-23 (EMT: "I don't see any symptoms going on right now").

- Defendants' explanation for using fentanyl and morphine was that "the drugs were given to help with pain"—not that it was appropriate treatment for someone experiencing a stroke.  R. at 33; *see also* R. Vol. II, Video 2 at 5:12 (EMT: "It's for the pain.").

- But Mr. Blake did not complain of pain or request pain meds.  R. at 33; R. Vol. II, Video 1 at 11:01-03 (EMT: "Are you hurting anywhere by chance?" Blake: "No man.").

Accepting the above allegations, as the Court must at this stage, there was *no* important government interest that justified administering Mr. Blake with morphine and fentanyl against his will.  *See Sell*, 539 U.S. at 180 ("First, a court must find that *important* governmental interests are at stake.").

---

[22] The second administration of medication happened after the video concluded; Mr. Blake had been removed from the restraint chair.

Unlike in *Harper*, there was no legitimate penological reason to medicate him: Mr. Blake was not dangerous and did not have a serious mental illness. R. at 10, 12. Not only was there no *penological* interest, there was no *medical* justification, especially given Mr. Blake's allegations that he was not in pain or requesting pain medication. *See Riggins*, 504 U.S. at 135; R. Vol. II, Video 1 at 11:01-03 (EMT: "Are you hurting anywhere by chance?" Blake: "No man."). In fact, morphine and fentanyl have the negative hallmarks of the types of antipsychotic drugs that the Supreme Court has expressed concern with, while lacking the benefits. *See Harper* at 229-30 ("While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects."); *accord Riggins*, 504 U.S. at 134.

Because Mr. Blake plausibly alleged there were no penological or medical justifications for his forced medication with fentanyl and morphine, he has sufficiently stated a Fourteenth Amendment claim. *See Riggins*, 504 U.S. at 135 ("Under *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness.").

### 2.     The District Court Erred in at Least Three Respects.

The District Court failed to reach the above conclusion because it made mistakes in interpreting Mr. Blake's allegations and in giving undue weight to the

*Martinez* Report. These mistakes meant the District Court did not meaningfully analyze Mr. Blake's forced medication claim and that its Fourteenth Amendment analysis more generally relied on inapposite case law to dismiss the Complaint.

### a. The District Court Misconstrued Mr. Blake's Allegations.

The District Court misconstrued Mr. Blake's allegations as conceding that the Defendants actually believed that he was having a stroke. R. at 12. As extensively detailed in the fact section, Mr. Blake in fact alleged that the prison guards *knew* that he was *not* having a stroke but pretended that he did. R. at 12. Thus, he is not disputing their "judgment," but arguing that they were lying about what they observed for retaliatory reasons. R. at 12.

Indeed, Mr. Blake's allegations are of a far-reaching retaliatory scheme against him, including retaliation for events that happened immediately prior to September 3, 2020. *See, e.g.*, R. at 31-35, 44-46. He offers not just allegations, but *evidence* that his medication and forced hospitalization was part of a scheme that caused him to be housed in segregated housing for one year and eight months based on a fabricated officer report. R. at 298 ("The narrative was indeed altered and what the narrative stated now was not what happened."); R. at 287 (alleging he had been in segregated houses for one year and eight months). These facts are so egregious that they attracted the attention of the press. *See* Blaise Mesa, *Kansas inmates say prisons discipline them for false reasons. One Man says it cost him*

*parole*, NPR KCUR (Oct. 11, 2023), https://www.kcur.org/news/2023-10-11/kansas-inmates-say-prisons-discipline-them-for-false-reasons-one-man-says-it-cost-him-parole (reviewing Mr. Blake's allegations regarding the September 3, 2020 unwanted medical treatment and the falsified report about statements made at the hospital).[23]

Flowing from the District Court's erroneous understanding of Mr. Blake's allegations of pretext, the District Court failed to appreciate Defendants' role in bringing about the administration of unwanted, inappropriate, and potentially lethal pain medication. Put another way, Mr. Blake would not have been forcibly medicated and taken to the hospital against his will had Defendants not lied about his symptomology in retaliation for his ongoing grievances. Thus, the District Court's determination that Defendants had no reason (or obligation) to question the medical judgment of administrating medication or sending Mr. Blake to the hospital does not hold up. The Defendants were the cause of the unnecessary treatment because it was founded on their misrepresentations, misrepresentations

---

[23] This article was not released until October 11, 2023, after the District Court's August 17, 2022 decision. R. at 45. The Court may take judicial notice that the article was published. *Abady v. Lipocine Inc.*, No. 2:19-cv-00906, 2023 WL 2933080, *2 (D. Utah Apr. 13, 2023) ("[W]hen judicial notice is taken of a document such as a news article or report, it is done so only 'for proof that something is publicly known, not for the truth of the [document's] other assertions." (quoting *Est. of Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016))).

that the video evidence *confirms* Defendants repeated to EMTs.  R. Vol. II,

Video 2 at 12:24-28.

The actual allegations set this case apart from *Lowry v. Honeycutt*, 211 F.

App'x 709, 712 (10th Cir. 2007), on which the District Court relied.  R. at 313.  In

*Lowry*, guards witnessed the inmate-plaintiff engaged in horseplay "which had

some sexual content."  *Id.* at 710.  The inmate-plaintiff insisted that the behavior

was consensual, but the guards nonetheless performed a rape examination, where

an officer allegedly humiliated the inmate-plaintiff.  *Id.* at 710-11.  When the

inmate-plaintiff brought a forced medication claim under the Fourteenth

Amendment, the district court dismissed it because the plaintiff did not dispute that

he "was observed by a guard engaging in such [sexual] activity and another guard

reported he had admitted sexual activity."  *Id.* at 711.  This Court affirmed "in light

of prison officials' legitimate concerns about the health risks of sexual assault and

sexually transmitted diseases."  *Id.* at 712.

Critically, the *Lowry* allegations did not indicate that the medical treatment

at issue—a rape kit—"was inconsistent with legitimate medical and penological

objectives."  *Id.* at 713.  Nor was there any dispute that the guards in *Lowry*

actually witnessed the inmate engaging in the activity that led to the decision to

perform the rape kit.  *Id.* at 710.  But here, Mr. Blake has plausibly alleged that

administering morphine and fentanyl *was* inconsistent with legitimate medical and

penological objectives.  Mr. Blake does not frame the issue as guards overreacting to something they actually saw, but as guards lying about what they saw to create a pretext to drug him and take him off site (and while there, invent a situation that resulted in Mr. Blake's placement in segregated housing for over a year).

### b.    The District Court Misapplied the Legal Standard.

The District Court applied the wrong legal standard by permitting forced medication so long as Defendants had either a medical "*or*" a penological objective.  *Compare* R. at 312 (quoting *Lowry*, 211 F. App'x at 712), *with Riggins*, 504 U.S. at 135 ("Under *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification ***and*** a determination of medical appropriateness." (emphasis added)).  As described above, the District Court's analysis stopped after it erroneously accepted at face value Defendants' purported medical justification that Mr. Blake exhibited stroke-like symptoms.  That is, the District Court disregarded that Mr. Blake alleged that he was not in pain and thus no pain medication was warranted and ignored the obvious misfit between narcotics and a stroke.  *See* R. 312-13.

The District Court compounded its error when it failed to meaningfully analyze whether there were penological objectives that justified administering narcotics to a prisoner against his will.  R. at 312-13.  In fact, the District Court's analysis focused entirely on Mr. Blake's hospitalization rather than forced

medication.  R. at 312-13.  Had the Court evaluated whether pain medication was necessary to further penological objectives, it would have concluded no.  Unlike antipsychotic medications, there is little logic in concluding that the pain medications fentanyl and morphine would have prevented Mr. Blake from being a danger to himself or others, diminishing any penological objective in encouraging administration of this medication.  *Cf.* R. at 33 ("KDOC has never volunteered a narcotic for pain relief.  In fact narcotics are rarely used.").

> ### c. The District Court Used the *Martinez* Report to Resolve Disputed Facts and Failed to Read the Facts in the Light Most Favorable to Mr. Blake.

Not only did the District Court err by applying the wrong legal standard, but it also misused the *Martinez* Report to *contradict* Mr. Blake's allegations.  *See Ali*, 763 F. App'x at 649 n.3 ("The *Martinez* report presents a different account of events than that provided in the Complaint. . . . But as the district court recognized, a *Martinez* report cannot be used to resolve factual disputes at the motion-to-dismiss stage."); *Winkel*, 704 F. App'x at 737.  The District Court concluded that Mr. Blake had not plausibly cast doubt on Defendants' motives, discounting Mr. Blake's allegations that Defendants had acted with retaliatory motive and using the video to draw inferences *against* Mr. Blake.  *See* R. at 313.  For example, the District Court relied on its conclusion that "the video recording submitted as an exhibit to the Report shows all EDCF personnel behaving calmly and respectfully,

even kindly, toward Plaintiff." R. at 313. And the District Court used this conclusion to *find* that Defendants must not have been acting with retaliatory purpose—indulging a non-sequitur that one cannot act kindly while facing a handheld camera and still be acting with retaliatory purpose. R. at 313. Mr. Blake has plausibly alleged that he was retaliated against by people who know how to cover their tracks, so *their* demeanor on a video they knew was being recorded should not be a dispositive fact and should not have been used to defeat his allegations to the contrary.

## B. Mr. Blake Plausibly States an Eighth Amendment Claim.

Based on the same allegations of forced, retaliatory medication and hospitalization, the District Court erred in dismissing Mr. Blake's Eighth Amendment claim, whether it is construed as an inhumane treatment claim or as an excessive force claim. This Court reviews dismissal of the Eighth Amendment claim de novo. *See Winkel*, 704 F. App'x at 766 ("We review de novo the district court's dismissal pursuant to § 1915A for failure to state a claim upon which relief can be granted.").

### 1. Mr. Blake Alleged that Defendants Intentionally Caused Him Harm for the Sake of Causing Him Harm.

The Eighth Amendment obligates prison officials to provide humane conditions of confinement and "take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v.*

*Palmer*, 468 U.S. 517, 526-27 (1984)).  For example, prisoners have a right to humane treatment, including a "right to be secure in their bodily integrity and free from attack by prison guards."  *Green v. Padilla*, No. CIV 19-0751 JB/JFR, 2023 WL 6540904, at *42, __ F. Supp. 3d __ (D.N.M. Oct. 6, 2023) (quoting *Hovater v. Robinson*, 1 F.3d 1063 (10th Cir. 1993)).

To establish a violation of such an Eighth Amendment right, Mr. Blake must allege (1) an objectively, sufficiently serious injury and (2) a subjectively "sufficiently culpable state of mind."  *Green*, 2023 WL 6540904, at *29; *Farmer*, 511 U.S. at 832.  Similarly, an inmate can establish an excessive force claim by showing that (1) "the use of force was objectively unreasonable" and (2) "that the official's intent was for the purpose of causing harm."  *Purkey v. Green*, 28 Fed. App'x 736 (10th Cir. 2011) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)); *see Wilkins v. Gaddy*, 559 U.S. 24, 37 (2010) (holding that even a minor injury can be sufficient to establish an excessive force claim if the injury was maliciously inflicted); *Miller v. Glanz*, 948 F.2d 1562, 1567 (10th Cir. 1991) (explaining that a battery lacking penological purpose and inflicted for the sake of causing harm satisfies the excessive force standard).

Mr. Blake's allegations satisfy all of these requirements.  He alleges Defendants conspired to invent a medical emergency to retaliate against him.  R. at 10, 12, 30-35.  Specifically, Defendants misrepresented that Mr. Blake was

exhibiting stroke-like symptoms, manufacturing a medical scenario designed to intentionally trigger his PTSD; then they encouraged EMT staff to inject him with addictive and potentially lethal pain medication and forced him to a hospital against his will. *E.g.*, R. at 12, 31-35, 44-46, 196, 198-203, 239-46, 309.

None of this was done for the sake of a legitimate penological interest. It was all done for the sake of causing harm. In fact, Mr. Blake's allegations are that Defendants *intentionally* put Mr. Blake in harm's way without acceptable justification, which is more than sufficient to satisfy the subjective component. *See Castillo v. Day*, 790 F.3d 1013, 1021 (10th Cir. 2015) (holding that a prisoner sufficiently shows a culpable state of mind by showing the defendant knew he "faced a substantial risk of harm and disregarded that risk" (quoting *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2015))); *see also Farmer*, 511 U.S. at 842 (holding that intent to harm is not required). Additionally, as a result of Defendants' conduct, Mr. Blake was exposed to potentially lethal narcotics, experienced an episode of PTSD, and contracted COVID-19. *See* R. at 33-34, 309. These conditions "present an objective 'substantial risk of serious' harm" necessary to plead an Eighth Amendment claim. *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009); *Miller*, 948 F.2d at 1567 (concluding the prisoner had stated

a claim under either the deliberate indifference standards or the excessive force theory by alleging that defendants intentionally inflicted harm through battery).

## 2. The District Court Erred by Deferring to the *Martinez* Report and Misconstruing Mr. Blake's Allegations.

As with the Fourteenth Amendment claim, the District Court erred in dismissing Mr. Blake's inhumane treatment claim principally because it failed to credit Mr. Blake's allegations that the Officers *did not believe* he was having a stroke. R. at 314 ("[Plaintiff] questions the medical judgment made by Defendant Christian, and he alleges corrections officers used excessive force in effectuating that judgment."); R. at 316 ("Plaintiff continues to disagree with Christian's assessment of him. . . . This is no more than a disagreement about a diagnosis."). Based on that misunderstanding, the District Court invoked inapposite case law. R. at 314-16. Aggravating that error, the District Court relied on the *Martinez* Report to contradict Mr. Blake's assertions that he was not exhibiting any symptoms of a stroke, marching through the *Martinez*'s Report's *unsworn* account of events as the backbone of its analysis. R. at 316 ("The *Martinez* Report describes the events as follows."). The District Court wrongly drew inferences from the video *against* Mr. Blake, implying that the Defendants would have been justified because of Mr. Blake's medical history. R. at 316.

**C.     The District Court Erred by Dismissing with Prejudice.**

Finally, the District Court erred by failing to grant Mr. Blake leave to amend

his Complaint.  While this Court reviews the decision for abuse of discretion, it

also must "consider de novo whether 'it is patently obvious that the plaintiff could

not prevail on the facts alleged, and allowing him an opportunity to amend his

complaint would be futile.'"  *Cohen v. Longshore*, 621 F.3d 1311, 1314-15 (10th

Cir. 2010) (quoting *Hall*, 935 F.2d at 1110).

To be clear, the above allegations are more than sufficient to make out

claims for constitutional deprivations at this stage in the proceedings.  But even if

they were not, courts should "freely" give leave, Fed. R. Civ. P. 15, especially for

*pro se* litigants who "are to be given reasonable opportunity to remedy the defects

in their pleadings."  *Hall,* 935 F.2d at 1110 n. 3; *accord Murray v. Archambo,* 132

F.3d 609, 612 (10th Cir. 1998).  In this case, there was no ground to deny leave to

amend, "such as undue delay, repeated failure to cure deficiencies in the pleadings,

or undue prejudice to the opposing party."  *Staats v. Cobb*, 455 F. App'x 816, 818

(10th Cir. 2011); *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th Cir.

1994) ("[A] court 'should dismiss *with leave to amend* . . . if it is at all possible that

the party against whom the dismissal is directed can correct the defect in the

pleading or state a claim for relief."  (quoting 6 C. Wright & A. Miller, Federal

Practice and Procedure § 1483, at 587 (2d ed. 1990))); *Kay*, 500 F.3d at 1217

("Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend" (quoting *Curley v. Perry*, 246 F.3d 1278, 1281 (10th Cir. 2001)). Moreover, the facts here suggest that Mr. Blake could allege an *additional* claim for violations of his First Amendment rights. *See Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (allegations that prisoner filed grievances and was shortly thereafter transferred to a supermax facility were sufficient to allege a First Amendment retaliation claim).

To the extent the District Court insisted that facts should be alleged in the Complaint itself, the record is replete with information showing that Mr. Blake could have added significant allegations. For example, he showed that he could add additional allegations related to retaliation and to how the forcible medication and hospitalization fit into a broader pattern of retaliatory conduct against him. Amendment would not have caused undue delay or prejudice, and Mr. Blake should have been permitted the opportunity to cure any deficiencies in his pleadings before dismissal. Thus, at a minimum, this Court should remand to permit Mr. Blake leave to amend to better clarify and supplement his allegations.

## CONCLUSION

For these reasons, Mr. Blake asks the court to reverse and remand this case back to the District Court.

Respectfully submitted,

SUMMIT LAW GROUP PLLC

By */s/ Selby P. Brown*
Selby P. Brown, WSBA #59303
Hathaway Burden, WSBA #52970
Molly Gibbons, WSBA #58357
315 5th Ave. S., Ste. 1000
Seattle, WA 98104
(206) 676-7000
Fax: (206) 676-7001
selbyb@summitlaw.com
hathawayb@summitlaw.com
mollyg@summitlaw.com

*Attorneys for Plaintiff-Appellant Blake*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(C) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[x] this document contains 8,900 words, or

[ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[x] this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: February 16, 2024

/s/ Selby P. Brown
Selby P. Brown, WSBA #59303
Hathaway Burden, WSBA #52970
Molly Gibbons, WSBA #58357
Attorneys for Plaintiff-Appellant Blake
315 5th Ave. S., Ste. 1000
Seattle, WA 98104
selbyb@summitlaw.com
hathawayb@summitlaw.com
mollyg@summitlaw.com
(206) 676-7000
Fax: (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 16, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF System.

*/s/ Selby P. Brown*